## NEW YORK LIFE INS. CO. v. BOARD OF ASSESSORS FOR THE PARISH OF ORLEANS et al.

(Circuit Court, E. D. Louisiana. January 11, 1908.)

1. TAXATION—TAXABLE CREDITS—"POLICY LOANS" MADE BY LIFE INSURANCE COMPANY.
Complainant, a New York life insurance corporation, made so-called "policy loans" to policy holders in Louisiana; the transactions being as follows: When sufficient premiums had been paid on a policy to give it a recognized reserve value, complainant on application would advance the amount of such reserve value to the holder, taking the policy in

pledge, and requiring the insured to pay in addition to each future annual premium a sum equal to the interest on the amount of the advance. Such advance was never collected until the policy matured or lapsed, when it was deducted from the amount due from complainant thereon. Complainant also made to some policy holders what were called "premium lien note loans," which were essentially the same as the policy loans; the only difference being that, instead of making an advance, complainant extended credit for premiums when due, taking notes which were in like manner charged against the reserve value of the policy. *Held*, that the transactions were not loans in either case, but were merely advance payments on the earned value of the policies, and did not constitute "credits" in favor of complainant, which were taxable.

2. SAME—BANK DEPOSIT—MONEY DEPOSITED SOLELY FOR TRANSMISSION.

A bank deposit kept by a New York life insurance company in New Orleans, in which collections were placed solely for transmission to New York, the amount deposited being reported daily, and a draft made each week by the treasurer of the company for the full amount of the week's deposits, against which no one in Louisiana was authorized to draw, and no part of which was used in the company's business in that state, is not taxable in Louisiana.

## In Equity.

This is a suit, in effect, to annul an assessment which is alleged to be illegal, null, and void. The New York Life Insurance Company, a New York corporation, seeks herein to have annulled, as illegal and void, an assessment against it for property taxes for the year 1906, made by the board of assessors for the parish of Orleans, state of Louisiana. The Louisiana statute requires every taxpayer to make annually in January a written and sworn return of all the taxable property owned by him in the state. When the board of assessors are satisfied that such return is incorrect or untrue, they are given authority to disregard it, and, from the best information they can obtain, to make such assessment of the taxpayer as in their judgment is right and fair. If the taxpayer objects to the assessment thus made by the board, he must make to them a written application to cancel their assessment and adopt his own return. When the board refuses this application, the taxpayer must then seek relief before the committee of review of the city council, and, if that committee also denies his request for the reduction or cancellation of the board's assessment, he is then permitted to bring suit against the board of assessors to demand the reduction or cancellation of the assessment complained of. The right to bring this suit is conditioned upon the taxpayer's prior compliance with the statutory requirements, first, to make a written and sworn return to the board of his taxable property; second, to apply to the board for the relief he claims; and, third, if the board refuses such relief, then to apply for it before the committee of review of assessments of the city council.

On January 25, 1906, complainant made in proper form and filed with the board of assessors its written and sworn return of its taxable property in Louisiana, as follows:

Money in possession, on deposit, or in hand...............$1,000 00
Furniture ............................................... 500 00
                                                          ―――――――
                                                          $1,500 00

The board of assessors declined to accept the above as a correct return of complainant's taxable property in Louisiana, and proceeded to enter in lieu thereof the following assessment against complainant on the assessment rolls for 1906, viz.:

Money loaned on interest, all credits, and all bills receivable for money loaned or advanced for goods sold..$568,900 00
Money in possession, on deposit, or in hand............ 51,700 00
Furniture ............................................. 500 00
                                                        ―――――――
                                                        $621,100 00

The board's assessment includes complainant's return of $1,500 and adds thereto the further sum of $619,600. The tax due on the assessment shown by complainant's return is $42. The tax due on the assessment as made by the board of assessors would be $17,390.80. The complainant tendered the tax admitted to be due on its own return ($42) and brought this suit to enjoin the collection of the remainder of the tax ($17,348.80), calculated on the board's added assessment of $619,600. The bill herein alleges that the complainant complied with the three statutory requirements and then tendered the tax admitted to be due. It is conceded that these averments are true and that the complainant is, therefore, properly before the court. The bill then alleges:

First. That the item on the board's assessment reading, "Money loaned on interest, all credits, and all bills receivable for money loaned or advanced for goods sold, $568,900," is based wholly on the board's conclusion that certain arrangements between complainant and its Louisiana policy holders made complainant the creditor of such Louisiana policy holders in the sum of $568,900. And it is alleged in the bill or urged in oral argument that this conclusion of the board was erroneous for two reasons, substantially as follows: (a) That the said arrangements were not in fact or in law loans by complainant to its Louisiana policy holders, but were in reality partial and advanced settlements made by complainant with these policy holders, pursuant to stipulations in the policies, of sums already earned under the policies, and it is claimed that the terms of these arrangements do no more than provide for crediting the complainant in its final settlement of the policies with the amounts so paid in advance to the policy holders, and at the same time secure to complainant the right to make this compensation. (b) That the arrangements in question, if held to be loans, were negotiated and made payable in the state of New York, and were evidenced by written instruments always kept in the state of New York, and which were never intended to be sent, nor ever by any business exigency, required to be sent, nor ever in fact sent for any purpose, to the state of Louisiana.

Second. The bill alleges that the increase made by the board in the item reading "Money in possession, on deposit, or in hand, $51,700," is based on an attempt by the board to tax money belonging to complainant while in transit or process of remission, from Louisiana to New York; the facts being as follows: Complainant keeps two bank accounts in the city of New Orleans, La., known as "No. 1 Account" and "No. 2 Account." In No. 1 account are deposited all premiums collected for complainant in Louisiana. Complainant's cashier in New Orleans mails every evening to complainant in New York a statement of the deposits on that day in this account. Complainant's treasurer in New York on Thursday of each week draws for the entire amount of the No. 1 account, as shown by the daily statements for the past week. The deposits in the No. 1 account are, so the bill alleges, solely for the purpose of transmission to New York, and no person in Louisiana has, or ever has had, the right to draw against this account or to make use of it for any purpose, and as a matter of fact the money in this account never has been drawn against or used in Louisiana, and no use has ever been made of the account, except for remission to New York in the way just stated. In No. 2 account money is deposited to an amount never to exceed $1,000 to pay the current expenses and disbursements of the New Orleans office, and the cashier in New Orleans has authority to draw on this No. 2 account. The board of assessors insist that complainant is taxable on the No. 1 account, as well as on the No. 2 account, and accordingly raised the assessment so as to include the average balances in the No. 1 account, thus making the item now in question $51.700, instead of $1,000. The bill claims that the money in the No. 1 account is money in transit, or in process of transmission, from Louisiana to New York, and is not taxable in Louisiana.

The answer admits, first, that complainant is a New York corporation, organized and domiciled as alleged in the bill, and generally engaged in the life insurance business in the manner stated in the bill, and that it has duly paid all license taxes imposed upon it by the Louisiana law; second, that the increase in complainant's assessment was made as alleged in the bill. But the answer insists, (a) that complainant had, within the state of Louisi-

ana, during the year 1906, credits to an amount much greater than $568,900; (b) that the amount on deposit in No. 1 account was properly and legally assessed, "for the reason that it is money in this jurisdiction, and enjoys the protection of this government, and is in no wise distinguished from any other taxable property so situated." It is conceded that complainant has no credits in Louisiana, unless such credits, if any, as arise from the arrangements between complainant and its policy holders hereinafter to be considered; and there is no dispute as to the facts of these arrangements. All the evidence respecting them was that given by complainant's own officers and witnesses, and no attempt was made to contradict or vary the account of the transactions as given by them.

Rice & Montgomery and James H. McIntosh, for complainant.
Geo. H. Terriberry, F. C. Zacharie, S. L. Gilmore, and H. G. Dupre, for defendant.

SAUNDERS, District Judge (after stating the facts as above). Under the foregoing pleadings and facts the issues to be decided are, first, whether the arrangements between complainant and its policy holders in Louisiana—said arrangements being known as either "policy loans" or "premium lien note loans"—constitute complainant a creditor of the Louisiana policy holders making such arrangements with it; and, second, whether the balances in complainant's No. 1 account in New Orleans are taxable in Louisiana. We will now consider the transactions out of which the board of assessors assume that credits have arisen in favor of the New York Life Insurance Company and on which they are taxable in Louisiana.

1. It is admitted, and it is, moreover, proved, that the complainant has no credits of any kind in the state of Louisiana, except such credits, if any, as grow out of those arrangements with its Louisiana policy holders that are known as either "policy loans" or "premium lien note loans." If then these arrangements are not, in reality, loans by complainant to its Louisiana policy holders, if they are essentially nothing but partial and anticipated settlements by complainant of its ultimate liability under the policies to its policy holders, then complainant has no credits in any shape in Louisiana on which it can be taxed there. The general and undisputed facts with regard to these two transactions are briefly as follows:

(a) Policy Loans. When the annual premium stipulated in a policy of life insurance has been paid for a certain number of years, the policy is said to have acquired, or to have earned, a "reserve value" in favor of the insured; that is, even though the insured should surrender the policy, or should fail to keep it up, he would none the less be entitled to demand that the company pay him a sum representing the reserve value of the policy. This reserve is, therefore, a fixed and certain sum, which the company is bound, in all events, to pay the insured at the maturity of the policy. But ordinarily it cannot be compelled to pay the reserve value before the policy matures. The amount of the reserve, at any given date, can always be accurately computed, and is in a compound ratio to the amount of the annual premium and the number of years for which the annual premium has been paid.

For the purposes of this case it is not material to consider the principles on which a reserve value is allowed to a life insurance policy holder, nor is it material to consider the factors in the calculation by

which actuaries compute the exact amount of this reserve. So far as concerns the matters involved in this suit, it suffices to recognize the fact that after it has been in force for a certain time every policy does acquire a reserve value as above stated, and that this reserve value increases steadily from year to year. After a policy has acquired a reserve value, the policy holder may obtain the use thereof in either of two ways: (1) A policy holder may not care to pay, or may not see his way to pay, the annual premiums accruing on the policy in the future, and may therefore decide to give up the policy altogether and to demand the payment to him of the whole of the reserve value. This election would completely and finally terminate the relations between the insured and the company, and would forever cut the insured off from any right to claim further benefits under the policy at its regular maturity. (2) If the insured is able and desirous to continue further payments of the annual premium on the policy, and so to keep it in force until it regularly matures, he may, with the consent of the company, but not as a matter of absolute right, take down the reserve value which the policy has already earned at a given date, under an agreement binding him to credit the company in the final settlement of its liability under the policy when it matures with the amount so taken down in advance by the policy holder. The company has the right to permit, or to refuse to permit, such anticipated withdrawal by the policy holder, and if it does consent to the withdrawal it does so on two conditions, viz.: (a) That the company shall be strictly secured in its right to deduct, in the ultimate settlement of its liability under the policy, the amount of the reserve so paid in advance of maturity to the policy holder. The most effective way to secure this right is by requiring the policy holder to deposit the policy in the hands of the company, with the agreement consenting to the company's crediting the advance payment in its final settlement. This delivery of the policy into the company's possession is naturally and not improperly spoken of as a "pledge." (b) That the interest-earning capacity of the fund from which the reserve value is taken shall not be diminished by such anticipated payment.

In the operation of all insurance companies, the amount of the annual premiums charged, the results promised by the companies to their policy holders, and the provision of a fund out of which the policies are eventually to be paid at maturity, are based upon calculations as to the total fund which will be accumulated from payments of annual premiums and from the interest that will be derived from the investment of these annual premiums as paid, and the reinvestment of this interest when earned, and so on. These calculations assume that all the premiums paid will constitute an interest-earning fund. Obviously, then, the calculations would be vitiated, and the results would be less than computed, if parts of the premium fund were used to pay reserve values and thus be withdrawn from the interest-earning fund. But this error can be avoided if the persons withdrawing earned reserve values and yet continuing their policies in force are required to pay annually to the company the same sum which the amount withdrawn by them would have earned as interest if it had not been paid to them. It is estimated that this fund from which the reserve values

are taken earns an average interest of 5 per cent. per annum. In order, therefore, that the final result may not be impaired, the policy holder who takes down the earned reserve value of his policy before its maturity must pay a sum equal to 5 per cent. per annum interest on the amount which he thus takes down. This additional payment may be called "interest," or it may be called an "additional premium." As a matter of fact it is essentially an additional premium paid by the policy holder in order to obtain the privilege of drawing down the earned reserve value of his policy. It is thereafter treated strictly as a part of the premium. The company requires payment of this additional sum on the same day on which the original premium is paid. The same notice is sent by the company to the policy holder to remind the latter of the approaching advent of the day on which the premium and the additional sum will become due, and failure to pay this additional sum is attended by the same consequences which attend the failure to pay the original premium.

As I have just stated, the company is not ordinarily under any obligation to pay to a policy holder the earned reserve value of a policy until the policy matures in any of the ways stipulated by its terms and there is a complete and final settlement of the company's entire liability under the policy. But the company may, and in many cases does, consent to make this anticipated payment. Before doing so, however, it appears that the company considers the facts of each case. The title to the policy may have become involved, so that it may be questionable who has the legal right to demand and receive the anticipated payment and to agree that it shall be used as a credit to the company in its final settlement under the policy; or it may be that the policy is one which, for business reasons, the company would desire to be relieved from, and in this situation it would not care to give any assistance to the policy holder which might enable him to keep it up. And there may be other business reasons why the company in a particular instance would be unwilling to assist the policy holder by consenting to pay in advance the earned value of the policy. Accordingly, in every instance except in the policies in which there is a contractual agreement to permit the policy holder to take down the earned value whenever he desires, the policy holder must apply to the company for its consent to the arrangement, and must make the arrangement, if at all, on the terms dictated by the company as the conditions of its consent.

The arrangements above described are called "policy loans." This name is from every point of view a misnomer. The transaction is not a loan at all. It is merely a consent by the debtor to pay in advance of the maturity of the debt which he owes, and to pay under conditions which the protection of the debtor's business requires. The personal solvency or desirability of the policy holder as a borrower is not considered at all, but only the sum that the policy has already and certainly earned for the policy holder through the premiums already paid in. No matter how solvent the policy holder may be, he cannot, under the policy loan obtain from the company more than the reserve value already earned by his policy. No matter how insolvent he may be, if the arrangement is made with him, he will get the amount of the reserve value. Neither is the policy holder under any obligation, on

thus obtaining the reserve value of his policy, to repay that amount at any time to the company. His only obligation is to pay an additional premium equal to 5 per cent. on the reserve value drawn down, and to credit the company with the reserve value paid to him in the final settlement between himself and the company.

It may be further noted generally, with regard to the so-called policy loan arrangements, as just described, that it is provided that the policy holder may, if he wishes, return to the company the reserve value which he has taken out, and on such return his obligation to pay the additional sum equal to 5 per cent. of the reserve value taken out at once ceases. But if it is not convenient to the withdrawing policy holder to make this return he cannot be compelled to do so, but may keep the money so paid him until the policy matures, and then simply credit it on the total amount of the company's ultimate liability under the policy. Further, some policies contain statements, printed in the policy or indorsed on them, showing the amount of the reserve value from year to year, and giving the policy holders the right to claim such reserve value on the terms above stated. In other policies there is no such statement, and the policy holder has no right to claim such reserve value, and in every such case, where the policy holder applies for the benefit of the reserve value, it is necessary to require the company's actuary to calculate the amount of the reserve value.

The real nature of the policy loan arrangements is clear enough, if regard be had only to the facts of the situation. It has been greatly obscured, however, by the terms used by the company to designate it. In hereafter referring to the arrangement as a "policy loan," I do not mean to intimate that it is a loan at all. I merely designate by this name the arrangement between the policy holder and the company whereby the policy holder gets immediate use and control of the earned reserve value of the policy. The only evidence in the record as to the conditions and terms under which and the manner in which the arrangements known as "policy loans" are made by the company with its policy holders is that given by the complainant's officers. The defendants have made no effort to contradict or qualify in any particular the testimony of these witnesses, which may therefore be accepted as accurately stating the facts.

Mr. John C. McCall, the secretary of the New York Life Insurance Company, testifies:

"Loans made by the company to policy holders in Louisiana are made because the policy holders hold policy contracts and have paid in cash premiums enough to create a reserve which makes their policy contracts adequate security for the loans, and because they have made application to the company for such loans; and the division of policy loans, on investigating the policy and the title to it, was satisfied the policy as a pledge would adequately secure the repayment of the loan. * * * Some policy contracts provide for loans. Some do not. As a rule, the company will make a loan on the security of any policy upon which premiums in cash have been paid so as to create a reserve which will fully secure the repayment of the amount of the loan applied for, whether the policy provides for the loan or not."

Mr. George C. Newton, superintendent of the division of policy loans, testifies regarding these arrangements as follows:

"The functions of the division [of policy loans] are to receive and consider applications for such loans, to accept or reject them, and, if it accepts them,

to cause the loan contract to be properly executed, and to accept delivery thereof and receive the policy in pledge as security for the repayment of the loan, to pay to the borrower the proceeds of the loan, and to transmit the loan contract and the pledge security to the company's division of policy loan securities, when the loan transaction is completed. * * * The company commenced to make loans on policies in 1892, and has made loans of that kind from 1892 until the present time. Most of the company's policies ever since 1892 have contained an agreement under which the policy holder may obtain from the company a cash loan on the sole security of the policy, on written request at any time after the policy has been in force a specified number of years, if premiums have been paid to the anniversary of the insurance next succeeding the date when the loan might be obtained; the insured to pledge the policy and its accumulations as collateral security for the loan in accordance with the terms of the company's form of loan agreement; the policy in most cases stating the amount of loan available at any given time, and requiring that the loan should bear interest at the rate of 5 per cent. per annum, payable in advance. * * * It has never been the practice of the company to and it never has asked a policy holder to pay a loan as long as his policy continued in force and he paid his interest according to the terms of the loan agreement. It never sent a policy loan agreement into the state of Louisiana for collection, and does not expect to do so. It never collected the amount of a loan, and does not contemplate doing so on any policy made to any policy holder in the state of Louisiana by legal process, either in the state of Louisiana or elsewhere. The company has never made a loan unless it had in its own possession on account of the value of the policy acquired by the payment of premiums thereon in cash ample value as security for the loan. * * * Q. In making loans on policies, you may state, if you know, on what the company places its reliance for their final payment? A. It relies solely for the payment of such loans upon the reserve value of the policy which is pledged as security for the loan. The financial responsibility of the policy holder is never an element that enters into the company's consideration in making such loans or in dealing with them."

The foregoing extracts sufficiently show that the question in every application for the policy loan is whether the company will consent to pay the policy holder in advance the then earned reserve value of the policy. When the policy holder has made application for the so-called policy loan, and the company has agreed to allow his application, the next step is for the policy holder to execute what is known as the "policy loan agreement." That document reads as follows:

### Policy Loan Agreement.

Whereas, the undersigned have this day duly received from the New York Life Insurance Company ———— dollars ($————), in cash, as a loan upon policy No. ————, issued by said company on the life of ————: Therefore, in consideration of the premises, the undersigned hereby agrees as follows:

(1) To pay said company interest on said loan at the rate of five per cent. per annum, payable in advance from this date to the next anniversary of said policy, and annually in advance on said anniversary and thereafter.

(2) To pledge, and do hereby pledge, said policy as collateral security for the payment of said loan and interest, and herewith deposit said policy with said company at its home office.

(3) To pay said company said sum when due, with interest, reserving, however, the right to reclaim said policy by repayment of said loan, with interest, at any time before due, said repayment to cancel this agreement without further action.

(4) That said loan shall become due and payable:

(a) Either if any premium on said policy or any interest on said loan is not paid on the date when due, in which event said pledge shall, without demand or notice of any kind, every demand and notice being hereby waived, be foreclosed by said company by deducting the amount due on said loan from

the reserve on said policy computed according to the American Experience Table of Mortality and interest at the rate of four and one-half per cent. per annum; and if after said deduction there is any balance of said reserve as so computed, said balance shall be taken as a single premium of life insurance at the published rates of said company at the time said policy was issued, and shall be applied to purchase upon the life of the insured under said policy, at the age of said insured on said due date, paid-up insurance for such amount as said balance will buy, payable under the same conditions as the original policy, but without premium return, participation in profits, or further payment of premiums.

(b) Or (1) on the maturity of the policy as a death claim or an endowment; (2) on the surrender of the policy for a cash value; (3) on the completion of any tontine or accumulation dividend period. In any such event, the amount due on said loan shall be deducted from the sum to be paid or allowed under said policy.

(5) That the application for said loan was made to said company at its home office in the city of New York, was accepted, the money paid by it, and this agreement made and delivered there; that said principal and interest are payable at said home office; and that this contract is made under and pursuant to the laws of the state of New York, the place of said contract being said home office of said company.

In witness whereof, the said parties hereto have hereunto set their hands and affixed their seals this ―――― day of ――――, 190―.

――――――――― [L. S.]

――――――――― [L. S.]

――――――――― [L. S.]

Signed and Sealed in presence of

―――――――――

Forwarded from ―――― Branch Office, Prem. Paid in full to ――――.

――――, 190―.                                                    B. N. $ ――――.

――――――――, Cashier.

The foregoing agreement recites that the policy holder has received a stated sum of money as a loan upon a given policy issued by the company, and that in consideration thereof the policy holder agrees to pay annually, in advance, 5 per cent. per annum interest on the amount of said sum, to pledge his policy as collateral to secure the payment of the loan and interest, and, finally, to pay said company said sum when due; and then the agreement goes on to declare that said loan shall become due and payable (1) on the failure to pay any annual premium, or the above stated interest, when due; (2) when the policy matures. That is, the so-called loan agreement expressly provides that the so-called loan shall not be due until the policy matures in one of the ways provided for by its terms, and the so-called loan is then, under the very terms of the loan agreement, to be paid by crediting the amount of the so-called loan on the company's eventual liability under the policy when matured. The stipulation contained in the loan agreement thus demonstrates that the transaction is not a loan, but is a partial payment by the company on account and in reduction of its eventual liability. As long as the 5 per cent. interest on the payment is paid by the policy holder, under the very terms of the loan agreement, he cannot be required to repay the principal, and, as the stipulation shows, the sum charged as interest is, in reality, an additional premium, which is necessitated by the reasons hereinabove stated.

Mr. McCall testifies:

"Notice of interest due on such loans, as well as on premium lien note loans, is made up at the comptroller's department in the home office at the

same time with and as a part of the notice of premium, and is sent by mail to the policy holder at least 15, and not more than 45 days before the due date of the premium and interest; the interest on all loans being made payable the due date of the premium. * * * The receipt of the premium and interest at the home office the company treats as a continuation of the loan, and never takes any formal action in respect of renewal. If the premium or interest is not paid when due, the loan is foreclosed at the home office."

Mr. John J. Mahoney, chief clerk in the note division of the comptroller's department of the New York Life Insurance Company, says, on the same subject:

"The amount of interest due on the anniversary of the policy is made a part of the premium notice that the company sends out before the premium becomes due and the interest is collected with the premium. * * * If, however, default is made in payment of interest on the note, it has always been the company's practice to, and it does, thereupon satisfy the debt evidenced by the note at the home office of the company by deducting the amount of it from the value of the policy."

And he further says:

"Subsequent interest payments are not indorsed on the note, but are indorsed on the company's premium card in the comptroller's department."

Mr. Newton testifies:

"My division figures the interest on policy loans which will be due on the due date of the premium and sends a memorandum thereof to the comptroller's department. That department before the maturity of the premium makes up a notice to the policy holder showing the amount of premium and interest that will be due, the due date thereof, and advising the policy holder that the premium is payable at the home office, but usually also authorizing him to pay it to the cashier of the branch office in his vicinity. If the policy holder pays the premium, he usually also pays the interest, and both are paid either by remitting directly to the home office, where it is received in the comptroller's department, or if they pay to the office in their vicinity, it is reported each day by that office to the comptroller's department, and drawn out of the company's No. 1 bank account by the treasurer's department on Thursday of each week."

It is shown by the evidence that the nonpayment of the so-called interest on policy loans has the same effect in terminating the policy that the nonpayment of the premium itself has. Mr. Newton testifies:

"If interest on the loan was not paid when due, or the policy lapsed for the nonpayment of premium, it was the duty of my division to, and we did, foreclose the loan in the manner described in the loan agreement and sent a letter to the policy holder advising him of the foreclosure."

These notices are in the testimony, and show that the policy holder is informed by them that:

"The premium and interest due on said policy on the ——— day of ———, 190—, not having been paid, the principal of said loan became due, and settlement of said indebtedness has been made in accordance with the terms of the policy, which is returned inclosed, indorsed for ——— years and ——— months continued insurance. Yours truly."

The so-called foreclosure is simply treating the policy as matured, just as it would be by the nonpayment of a premium, by death, or by the expiration of a tontine period, or by the effect of any other

condition in the policy. On this assumption the policy holder has various options as to what shall be done with the balance due him under the policy, treated as matured, remaining after crediting the company with the advance payment. The policy holder may apply the balance remaining to his credit on the matured policy, either in purchasing paid-up insurance, or in paying for continued insurance, or he may take the balance down in cash.

To me it is very clear that this entire transaction called the "policy loan" is not in any respect a loan, but is an anticipated settlement made with the consent of the company, and based upon the earned value of the policy at the date of the so-called policy loan. In other words, it is a mere incident and modification of the original contract of insurance on the life of the policy holder. The insurance company acquires no credit under this arrangement, other than the maker of a promissory note would acquire if he made a partial payment upon that note before its maturity. I therefore hold that the policy loan arrangements do not establish any "credits" in favor of the insurance company on which the insurance company can be taxed, either by the laws of Louisiana or by the laws of any other state.

(6) Premium Lien Note Loans. The so-called "premium lien note loan" is merely a modification of the policy loan arrangement, and is based upon the existence of the same reserve value earned by the policy through the cash premiums which have been paid upon it for a given number of years. The policy holder is permitted to make use of this reserve for paying the premiums on his policy under essentially the same conditions which apply to the policy loan contracts hereinabove considered. Mr. Mahoney, in charge of the department that issues the premium lien note loans, testifies about them as follows:

"The complainant has never taken a premium lien note, except from a policy holder in settlement in whole or in part of a renewal premium, nor has it ever taken such note, except in settlement in whole or in part of a renewal premium on a policy upon which enough premiums had theretofore been paid in cash to create a reserve on the policy equal to or greater than the amount of the premium lien note. Under certain forms of policies, and where the policy had acquired by payment of premiums in cash a reserve equal to or greater than the note, the company has sometimes accepted from the policy holder a premium lien note in settlement in whole or in part of a premium when the policy holder could not or would not pay the premium in cash. * * * In acting on such application we have always considered the form of the policy holder's policy contract, the number of premiums that have been paid in cash, and ascertained and considered the reserve value of the policy, and if in view of all these things we are satisfied that the company could safely accept a premium lien note in settlement in whole or in part of the premium, and in all other respects the transaction was such that the company deemed it desirable to accept the premium lien note, we then in my division filled in the company's customary form for premium lien note with the dates, amount, and other data in the blanks left in the form for that purpose. * * * If, however, on considering the application in the note division, it was ascertained that the policy holder's policy was one in respect to which the company did not care to accept a premium lien note, or the cash premiums had been insufficient to create the required reserve, or if the risk was believed to be impaired, or if, for any other reason, we concluded that it would not be advisable to accept a premium lien note, we then and there declined the application."

And again:

"Q. In accepting such notes, on what does the company place its reliance for their final payment? A. It relies for their final payment solely upon the reserve value of the policy, which, of course, is in the company's own possession and control at its home office in the city of New York. The financial responsibility of the maker thereof is never an element considered by the company in determining whether or not we will accept such note. Q. You may state whether or not the company has ever demanded payment of any of such notes? A. It never has. It never accepts such a note, unless it has in its own possession money held for the ultimate benefit of the policy holder with which to pay it."

And with regard to the interest carried by these premium lien notes (the same as the interest carried by the policy loans). Mr. Mahoney says:

"If, however, default is made in payment of interest on the note, it has always been the company's practice to, and it does, thereupon satisfy the debt evidenced by the note at the home office of the company by deducting the amount of it from the value of the policy. The amount of interest due on the anniversary of the policy is made a part of the premium notice that the company sends out before the premium becomes due, and the interest is collected with the premium. Both the premium and the interest are payable at the home office in New York City, but ordinarily the company in the premium notice authorizes the policy holder to pay either directly to the home office or at the company's local office."

The premium lien note reads as follows:

### Premium Lien Note.

$———                                                  ———, 190—.

——— after date I promise to pay to the order of the New York Life Insurance Company at the office of said company in the city of New York, with interest in advance at the rate of five per cent. per annum (for value received), being for premium due ——— on policy No. ——— issued by said company on the life of ———. It is understood and agreed:

(1) That this note may be renewed, if the interest thereon and subsequent premiums on said policy are duly paid.

(2) That if any premium on said policy, or interest on this note, is not paid when due, this note shall thereupon immediately become due and payable, with interest, and shall, without notice of any kind, be paid by deducting the amount due thereon from the sum which by the terms of said policy is applicable to the purchase of insurance in the event of nonpayment of premium or interest when due, the balance only of said sum, if any, to be available for the purchase of insurance under and pursuant to the nonforfeiture provision of said policy.

(3) That in the settlement of any claim or any benefit under said policy before this obligation shall have been fully paid the amount of this note shall be deducted from the amount otherwise payable by said company.

Signature of the person whose life is insured        ———————

Signature of the person or persons for whose benefit the in-———————
    surance is effected.                              ———————

It will be observed that, while the date of payment is given in the premium lien note, yet it is expressly stipulated that if the interest and subsequent premiums on the policy are paid the note shall be renewed, and that the note shall only become due if subsequent premiums or interest are not paid. And the note contains provisions for offsetting the amount of the note in the final settlement of the policy. These premium lien notes are, in all substantial respects, the same as the policy loans, merely evidencing a condition of the arrangement

for giving the policy holder the immediate use of the earned value of the policy under the obligation to allow it as a credit to the company in the eventual settlement of the policy.

Finally, the company issues a few "blue notes," as they are called, which are merely extensions of time for paying premiums when the policy holder is unable to pay them at their maturity. These notes are given simply to evidence an agreement of the company to extend the time for paying the premium, and they contain a clause that, if the note is paid in full by the extended date given on the face of the note, the policy shall continue in force; but "that, if this note is not paid on or before the day it becomes due, it shall thereupon automatically cease to be a claim against the maker," and the policy lapses. These instruments are clearly not credits, but mere agreements to extend the time for paying the premiums.

I therefore find, under the facts above stated, that the complainant company has no credits of any kind whatever in the state of Louisiana, and the injunction against the collection of the tax on the assessment of $568,900 must therefore issue.

2. With regard to the attempt of the assessors to include in their assessment the average balances in No. 1 bank account in New Orleans, the evidence establishes conclusively that the collections for complainant in Louisiana are deposited in this account solely for transmission, and that they are not used, or drawn against, by any person in the state of Louisiana. It certainly could not be contended that if these collections were at once invested in New York exchange, without being put in bank at all, they would become subject to taxation. That money deposited in bank in one state, solely for transmission through such bank to another state, is not taxable in the state in which the bank is located, was expressly decided in Metropolitan Life Ins. Co. v. Newark, 62 N. J. Law, 74, 40 Atl. 573; and that decision seems to me to state the law correctly. The cases in Louisiana which have held that deposits in bank to the credit of a nonresident are taxable in this state proceeded on the admitted fact that the deposits were controlled by some agent of the depositor in Louisiana, and were used for the purposes of the depositor's business in Lousiana. Clason v. City of New Orleans, 46 La. Ann. 1, 14 South. 306; Bluefields Banana Co. v. Assessors, 49 La. Ann. 43, 21 South. 627; Parker v. Strauss, 49 La. Ann. 1173, 22 South. 329. In this case it is shown that the complainant's No. 1 account is not controlled by any agent of complainant in Louisiana and is not used to the slightest extent on any occasion for any purpose of complainant's business in Louisiana. I therefore hold that the increase of the assessment from $1,000, as returned by the complainant, to $51,700, as made by the assessors, so as to include in the assessment the average balances in No. 1 bank account, is illegal, and that the injunction should issue as prayed for by complainant, restraining the collection of taxes on this item of the assessment made by the board of assessors.

In conclusion it may be said that it would be most unfortunate for Louisiana if her laws did authorize, or attempt to authorize, the taxation sought to be imposed in this case. It would be equivalent to

exacting a tax of nearly 3 per cent. on the premiums as they were collected and remitted from the state and a similar tax on sums paid under the policy. It would deprive the policy holders of the right to obtain any advantage from their policies before maturity, unless they consented to being taxed 3 per cent. on the amounts collected before maturity; for it is not conceivable that the company will consent to bear this tax on anticipated payments to its policy holders which it makes solely for their accommodation. And it may with equal confidence be assumed that, if the state taxes the premiums paid by its citizens and remitted to the complainant, it will become necessary for the complainant to devolve the ultimate payment of this tax on the policy holder. The net result of the scheme of taxation asserted by defendants would be to compel citizens of Louisiana to pay 3 per cent. more for premiums on their life insurance, and to get 3 per cent. less from their policies than citizens of other states; for, if the state can legitimately levy a tax of 3 per cent. on partial and anticipated payments by the company under the policy, it can on the same principle levy the same tax on the entire and final payment of the policy, and that will no doubt be the next move. The final payment is a credit in the same sense as the provisional and partial payments, and one is as taxable as the other. While it is not necessary, under the view I take of this case, to decide whether the complainant would be taxable on its policy loans, even if they were loans in a legal sense, I may say that in view of the manner in which these so-called loans are negotiated, and in view of the fact that they are evidenced by written instruments held always in New York and there settled, I do not think the complainant would in any case be taxable in Louisiana with respect to them. The facts as to the arrangements are accurately as stated in the bill.

It is urged that in the case of Metropolitan Life Ins. Co. v. New Orleans, 115 La. 708, 39 South. 846, 9 L. R. A. (N. S.) 1240, 116 Am. St. Rep. 179, affirmed by the Supreme Court of the United States in 205 U. S. 395, 27 Sup. Ct. 499, 51 L. Ed. 853, it was held that a life insurance company organized and domiciled in New York was taxable in Louisiana on policy loans made in the latter state. But it does not appear from the report of the case that the arrangements described as "policy loans" in the case cited were the same arrangements as are described by that name in this case. The terms of the obligations are not recited in the opinion of either court, and it seems to have been assumed and conceded, and for aught that appears to the contrary it may have been the fact, that the "policy loans" in the Metropolitan Case may have been loans in the ordinary sense. It is certainly to be presumed that, if the "policy loans" in that case had been the arrangements which the "policy loans" of the complainant are shown to be in this case, that fact would have been called to the attention of the court. In the Metropolitan Case the court dealt with the "policy loans" before them as if they were ordinary loans, and I am bound to assume they were. But the "policy loans" in this case are not ordinary loans, nor loans in any sense.

Judgment will be for complainant as prayed for.